AO 91 (Rev. 11/11)   Criminal Complaint

**LODGED**
CLERK, U.S. DISTRICT COURT

**JUL 12 2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ rsm _____ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

**July 12, 2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MR _____ DEPUTY

United States of America　　　　)
v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　)　Case No.　**2:24-mj-04178-DUTY**
MICHELLE BISNOFF,　　　　　　)
aka "Michelle Angeline Silverstein,"　)
aka "Shelly Silverstein,"　　　　　)
　　　　　　　　　　　　　　　)
_____)
*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___Oct. 21, 2019 & Feb. 4, 2021___ in the county of ___Los Angeles___ in the ___Central___ District of ___California___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Count 1<br>15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R.<br>§ 240.10b-5 | Securities Fraud |
| Count 2<br>18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

Please see attached affidavit.

☐ Continued on the attached sheet.

_____
*Complainant's signature*

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___07/12/2024___

_____
*Judge's signature*

City and state: ___Los ageles, California___

Hon. Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

*AUSA:* Ranee Katzenstein(x2432)

## AFFIDAVIT

I, Marni A. Barton, being duly sworn, declare and state as follows:

### I.  BACKGROUND OF SPECIAL AGENT BARTON

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since July of 2004.  I am currently assigned to the Los Angeles Division's Santa Maria Resident Agency and have been so assigned since 2011.  I have participated in various investigations involving complex financial crimes, public corruption, computer crimes and counterintelligence.  I have received specialized training from the FBI regarding complex financial crimes and national security investigations.  I graduated from California Polytechnic State University, San Luis Obispo, and obtained a degree in Business Administration with a concentration in Accounting.  Prior to joining the FBI, I worked as a staff accountant, trust accountant and an accredited pension administrator for approximately eight years.

### II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a criminal complaint against, and arrest warrant for:

> **MICHELLE BISNOFF,** also known as MICHELLE ANGELINE SILVERSTEIN and SHELLY SILVERSTEIN **("BISNOFF")** (year of birth: 1966)

for violations of 18 U.S.C. § 1343 (Wire Fraud)[1]; and 15 U.S.C.
§§ 78j(b) and 78ff and 17, C.F.R. § 240.10b-5 (Securities
Fraud).[2]

---

[1] For a defendant to be found guilty of wire fraud, in violation of 18 U.S.C. § 1343, the government must prove each of the following elements beyond a reasonable doubt:

(1)  The defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

(2)  The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

(3)  The defendant acted with the intent to defraud; that is, the intent to deceive and cheat; and

(4)  The defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

*Ninth Circuit Model Criminal Jury Instruction No. 15.35 (Aug. 2023)*

[2] *For* a defendant to be found guilty of securities fraud under 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5, the government must prove each of the following elements beyond a reasonable doubt:

(1)  The defendant willfully used a device or scheme to defraud someone, made an untrue statement of a material fact, failed to disclose a material fact that resulted in making the defendant's statement misleading, or engaged in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person;

(2)  The defendant's acts were undertaken, the statement was made, or the failure to disclose was done in connection with the purchase or sale of a security;

(3)  The defendant directly or indirectly used the instrumentalities of interstate commerce [e.g., wire communications] in connection with these acts, making this statement, or this failure to disclose; and

(4)  The defendant acted knowingly.

*Ninth Circuit Model Criminal Jury Instruction Number 15.47 (Dec. 2020).*

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel, witnesses, analyses of records and documents obtained during the investigation, and publicly available records, including property records and civil litigation files.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only; all amounts, sums and calculations are approximate; and all dates and times are on or about those indicated.

### III.  SUMMARY OF PROBABLE CAUSE

4.    BISNOFF fraudulently solicited investments in her company ESOS RINGS, INC. ("ESOS"), by falsely representing ESOS's business activities and profitability, and the returns that the investors would receive.

5.    Beginning around February 2017 and continuing to in or around December 2023, BISNOFF made materially false statements, representations, and promises to victims to induce them to invest funds in ESOS. BISNOFF told prospective investors that: (1) BISNOFF and her company ESOS owned patents for "smart rings" that could be used to make contactless payments; (2) investments in ESOS would be used to increase the company's manufacturing capabilities and/or its inventory; (3) ESOS was imminently going

to be acquired or be infused with capital enabling it to quickly repurchase the company's stock, resulting in a substantial profit to the investors; and (4) ESOS was earning a substantial profit. My investigation has shown that these representations were false: Neither BISNOFF nor ESOS owned the patents at issue; the majority of investor funds raised were used to make Ponzi-like payments to earlier investors and to benefit BISNOFF personally; the prospective acquirors of ESOS had no knowledge of ESOS and/or no plan to provide capital for it; and ESOS had virtually no business operations, let alone profits.

6.    Investor funds were transmitted to ESOS bank accounts controlled by BISNOFF by means of interstate wires, including through the Fedwire Funds Service processing sites in New Jersey and Texas. According to an analysis conducted by an FBI Forensic Accountant, of the $2,140,250 of investor funds that BISNOFF obtained, approximately $775,806 was used to fund Ponzi payments to earlier investors; over $700,000 was used to pay the rent on her personal residence; and over $300,000 was transferred to BISNOFF'S personal bank account and then used by her to pay personal expenses.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.    Background on BISNOFF and ESOS

#### 1.    <u>BISNOFF</u>

7.    BISNOFF was a resident of Los Angeles from 2017 to 2023, when she became a resident of Santa Barbara, California. Since 2023, BISNOFF has resided in Boca Raton, Florida, at the SUBJECT PREMISES.

8.   BISNOFF worked for McLear US (described below) from January 2016 to October 24, 2016, when her employment was terminated.

9.   BISNOFF used the following accounts:

a.   Citibank, N.A. ("Citibank") personal joint checking account X0533. BISNOFF and her husband opened the account on March 8, 2016, and were the signatories on the account. Citibank is a federally insured financial institution based in New York, New York.

b.   American Express Company ("AMEX") credit card X2006. This account was opened in BISNOFF's name in March 2021.

2.   <u>ESOS</u>

10.   BISNOFF formed ESOS as a Delaware corporation in January 2017. ESOS' principal place of business was in Los Angeles and, after 2023, Santa Barbara, California. BISNOFF was the Chief Executive Officer ("CEO") of ESOS and its only control person.

11.   ESOS purported to manufacture and sell "smart rings," *i.e.,* wearable rings that could be used to make contactless payments, based on patents purportedly owned by ESOS. ESOS claimed it would make money by selling the rings to users and collecting interchange fees from the users' payment transactions.

12.   ESOS used the following bank accounts:

a.   Bank of America ("BofA") checking account X7373. BISNOFF and ESOS Chief Technology Officer ("CTO") Rex Scates opened the account on February 10, 2017, are the signatories on

the account.  BofA is a federally insured financial institution based in Charlotte, North Carolina.

      b.   Citibank business checking account X8828. BISNOFF opened the account on April 19, 2018, and was the sole signatory.

      c.   PNC Bank, N.A. ("PNC") corporate business account X3242 (previously BBVA account X5007[3] ). BISNOFF opened the account on August 17, 2018, and is the sole signatory. PNC is a federally insured financial institution based in Pittsburgh, Pennsylvania.

13.  Neither ESOS nor its securities were ever registered with the SEC.

      3.   <u>SEC Proceedings Against BISNOFF and ESOS</u>

14.  On September 12, 2023, the U.S. Securities and Exchange Commission ("SEC") sued BISNOFF and ESOS for securities fraud.[4]  On that same date, BISNOFF and ESOS, without admitting or denying the allegations in the SEC's complaint, consented to final judgments permanently enjoining them from violating the antifraud provisions of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Act of 1934, and Rule 10b-5 thereunder, and holding them jointly and severally liable to pay $566,483 in disgorgement and $46,836 in prejudgment interest. BISNOFF also consented to an officer-and-director bar, a $233,229 civil penalty, and a permanent injunction prohibiting

---

[3] PNC acquired BBVA on or about June 1, 2021.

[4] *Securities and Exchange Commission v. Esos Rings, Inc. and Michelle Silverstein aka Michelle Silverstein Bisnoff*, No. 2:23-cv-07553 (C.D. Cal., filed Sept. 12, 2023).

her from directly or indirectly, including, but not limited to, through any entity owned or controlled by her, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering.

15.  To date, neither BISNOFF nor ESOS has paid any of the amounts due.

### 4.   ESOS's EIDL Loan

16.  On March 30, 2020, BISNOFF, using the name "Michelle Silverstein" and identifying herself as the COO of "Esos Ring [sic] Inc", applied to the U.S. Small Business Administration ("SBA") for a $150,000 Economic Injury Disaster Loan ("EIDL"). The loan was approved and was funded on May 12, 2020.  The application stated that "Michelle Silverstein" owned 100% of the company and that in 2019, the company had gross revenues of $675,000 and the cost of goods sold was $350,000. On March 7, 2022, BISNOFF contacted the SBA and requested an increase in funding related to the 2020 EIDL loan. In response, the SBA requested a copy of ESOS's filed 2019 Federal Tax Return. On April 15, 2022, BISNOFF submitted a U.S. Corporation Income Tax Return, Form 1120, for 2019, which reported gross receipts or sales of $679,634, and cost of goods sold of $491,154.  The return stated that it had been prepared by Tia Uzzell of the firm Lifestyle and Career Essentials, located in Kansas City, Missouri.

17.  I believe the 2020 application and 2022 request for an increase in loan funding contained false information.  For example, based on my investigation, as described below, I know

that ESOS did not have gross receipts or sales of $679,634 in 2019, and that the tax return submitted in support of the loan funding increase request reported different numbers and a different preparer than appear on the 2019 tax return BISNOFF provided to prospective investors, as discussed in paragraphs 31, 94, 102, and 107 below.

**B.    The Scheme to Defraud**

18.    As part of the investigation to date, other FBI Agents and I have interviewed 11 victim-investors. Each recounted the false statements and representations that BISNOFF made, and many provided copies of emails, text messages, and documents BISNOFF provided and caused to be provided, including documents entitled "ESOS RINGS, INC. RESTRICTED STOCK AGREEMENT," in connection with her sale to them of a security, namely, shares of ESOS.[5]

1.    <u>BISNOFF's False Statements and Representations</u>

a.    *Patent Ownership*

19.    Based on interviews with victim-investors, I know that BISNOFF represented and caused ESOS to represent that ESOS owned the smart ring patents.

20.    I know that this representation was false based on interviews of Joseph Prencipe and my review of pleadings filed in civil litigation from which I learned the following:

---

[5] "Security" for purposes of the security fraud statute is broadly defined and includes "any note, stock, treasury stock, . . . certificate of interest or participation in any profit-sharing agreement . . ., transferable share, investment contract . . . , or in general, any instrument commonly known as a 'security.'" 15 U.S.C. § 78c(10).

21.    Prencipe is an attorney and business executive. In
2016, Prencipe was the CEO of McLear & Co., Inc. ("McLear US"),
which is a smart ring technology company. On April 12, 2016, the
U.S. Patent and Trademark Office ("USPTO") issued Patent No.
9,313,609 (the "'609 Patent") to Prencipe. The '609 Patent is a
smart ring technology patent titled "Contact Information Social
Exchange Method System" and Prencipe is listed as the sole
inventor. On October 10, 2016, Prencipe assigned the '609 Patent
to McLear US.

22.    In early 2017, Prencipe discovered that BISNOFF was
representing herself to others as the owner of McLear US and its
associated smart ring patent. Prencipe confronted BISNOFF.  In
response, BISNOFF sued Prencipe and McLear US in federal
district court for patent infringement, falsely claiming that
Prencipe had assigned the '609 Patent to ESOS.[6] Recognizing that
"the validity of the '609 patent assignment must be resolved
before the claim of patent infringement," the district court
held that it had no subject matter jurisdiction and dismissed
BISNOFF's suit without prejudice three days after it was filed.

23.    Three days after that, on February 27, 2017, BISNOFF
sued Prencipe and McLear US in state court for breach of
contract and other causes of action.[7]  McLear US filed a cross-
complaint alleging that BISNOFF had breached her Independent
Contractor Agreement ("ICA") including the prohibition against

---

[6] *ESOS Rings, Inc. v. Prencipe et al.*, Case No. 17-1381-RGK
(CACD), filed February 21, 2017.

[7] *ESOS v. Prencipe et al.*, Superior Court California, Case
No. BC652020.

using any of McLear US' confidential information. During these
proceedings, ESOS was subjected to an evidentiary sanction and
ESOS and BISNOFF were subjected to monetary sanctions, namely
$223,697 in attorney's fees, based on BISNOFF's deletion of
documents that were subject to a pending subpoena and motion to
quash.

24.  On January 31, 2023, a jury found BISNOFF liable for
breach of contract, breach of fiduciary duty, and conversion
(with malice, oppression and/or fraud). BISNOFF was ordered to
pay over $20,000,000 in compensatory and punitive damages.
McLear US was found to be the rightful owner of an undivided,
100 percent interest in the '609 Patent Family.[8] ESOS/BISNOFF was
found to have no ownership interest in the '609 Patent Family.
BISNOFF was ordered to pay attorney's fees to McLear US in the
total amount $7,187,496.

###### b.    Use of Investor Funds

25.  Based on interviews with victim-investors, I know that
BISNOFF represented and caused ESOS to represent that ESOS was
seeking outside investments to pay for increasing its
manufacturing capabilities, including the manufacturing ESOS was
doing in Wuhan, China, and to increase ESOS' inventory. BISNOFF
claimed ESOS would make money by selling rings to users and by
collecting interchange fees from users' payment transactions. I

---

[8] The '609 Patent Family includes but is not limited to U.S.
Patent numbers 10,412,558, 10,264,415, and 10,425,785, and
European Patent Application EP3748561, and covers a near-field
communication ("NFC") ring that can be used to make contactless
payments.

know that this representation was false based on information obtained in the investigation, including the following:

26. Rex Scates was interviewed and stated the following:

   a.   Scates was the CTO of ESOS. Scates did not receive a salary but had an ownership interest in ESOS.

   b.   Scates created only a couple thousand plastic ring prototypes for ESOS.

   c.   Only proof-of-concept rings were created. The rings were never produced on a large scale or manufactured overseas.

27. I interviewed S.S. and learned the following:

   a.   S.S. is the founder and CEO of Cascade Financial Technology Corporation ("Cascade"), a financial services company that partnered with banks to process and manage their prepaid debit/credit programs.  S.S. met BISNOFF around the end of 2016 or early 2017 when BISNOFF became a client of Cascade for ESOS. S.S. invested in ESOS (discussed further below) and was a member of the Board of Directors from 2017 through 2023.

   b.   According to S.S., ESOS rings were never produced on a large scale or manufactured overseas, and the few dozen rings that were manufactured were created on a 3D printer.

28. A review of ESOS's bank accounts showed that instead of using investor funds for ESOS business purposes, BISNOFF used a substantial amount of investor money to pay for personal expenses, such as the monthly rent for her luxury personal residence. BISNOFF's landlord told the FBI that around August 2016 BISNOFF and her family leased his Pacific Palisades home,

paying $13,000 per month to begin and, by the end of their tenancy in August 2021, $15,000 per month. According to an analysis conducted by an FBI Forensic Accountant, approximately $400,000 was transferred to BISNOFF's personal bank and investment accounts and approximately $30,000 was transferred by ESOS' business accounts to pay BISNOFF's personal AMEX.

        *c.   ESOS' purported profitability*

29.  Based on interviews with investors, I know that BISNOFF claimed ESOS was profitable and had entered into significant business deals for smart ring sales. Based on the investigation, I know this to be false.

        a.  S.S. stated that ESOS did not have any revenue during his time with the company. S.S. was shown certain tax and financial documents for ESOS that some investors had received from BISNOFF (described below), and said he was not aware of any basis for the revenue numbers appearing on the documents, *e.g.*, $3,127,000 reported for 2019.

        b.  According to S.S., ESOS only manufactured smart ring prototypes to be used as proof of concept, generating only a few cents per transaction.

30.  Based on my review of a financial analysis conducted by an FBI Forensic Accountant, I know that ESOS bank records reflect minimal or zero average monthly account balances prior to deposits of investor money and no deposits that can be attributed to ESOS's sale of, or revenue from, smart rings.

31.  BISNOFF provided several prospective investors with ESOS' purported financial statements and 2019 tax return. The

2019 tax return reported gross sales of $3,127,849.  The
statements were presented under a cover page identifying Jung
Novikoff & Stevens, LLP, and the third page of the statements
stated "Reviewed By: Marc Bronstein CPA XXX53 8/31/2020."
Bronstein was interviewed by the FBI and stated that neither he
nor his firm had prepared those documents or signed off on the
financial statements, and his purported signature on the tax
return had been forged.

> d.   *Expected Sale of, or Substantial Capital
>      Infusion into, ESOS*

32.  Based on interviews with victim-investors, I know that
BISNOFF represented and caused ESOS to represent that ESOS was
on the verge of being sold or was about to receive a large
capital infusion that would enable the company to quickly
repurchase investors' stock at a price substantially in excess
of what the investors had paid for it. Based on my
investigation, I know this to be false.

a.   Through its investigation, the SEC determined
that, in each instance, the purported new owner or large
investor either did not know ESOS or BISNOFF, had no documents
concerning them, or had only minimal contact with them. None of
the touted impending deals or capital infusions ever happened.

b.   A review of ESOS's bank accounts shows that those
buy-backs of shares that did occur were funded with monies
obtained from other victim-investors.

33.  BISNOFF provided investors numerous excuses for why
they had not received payment from the promised buy-backs of

their shares, including that ESOS's purported manufacturers overseas had shut down and that she had terminal cancer starting around year 2022. As discussed above, ESOS had no overseas manufacturers; as discussed below, an FBI review of BISNOFF's medical records did not identify any cancer-related diagnosis or treatment during the relevant timeframe.

      2.   Through the False Statements and Representations, BISNOFF Obtained Money from Victim-Investors

        a.   *Victim-Investor S.S.*

34. As noted above, S.S. met BISNOFF around the end of 2016 or early 2017 when BISNOFF became a client of Cascade for ESOS.

35. BISNOFF told S.S. that ESOS held two patents for smart ring technology that allowed users to make contactless payments from a physical ring.

36. Soon thereafter, BISNOFF told S.S. an ESOS board member was leaving the company, which made ESOS shares available for purchase. BISNOFF offered Cascade and S.S. the opportunity to invest $150,000 in ESOS in exchange for 40 percent of the existing shares and a seat on the ESOS Board of Directors. BISNOFF told S.S. that the $150,000 investment would be used to increase ESOS' manufacturing capabilities associated with scaling the company to produce 50,000 payment-enabled devices.

37. As a result of BISNOFF's false and misleading statements, S.S. formed a company called Wearable Fintech to invest in ESOS and wired the following amounts on the following dates ESOS BofA account ending in 7373:

       a.    $75,000 on February 10, 2017;

       b.    $75,000 on March 3, 2017.

38. Based on BISNOFF's representations, S.S. understood that BISNOFF was responsible for obtaining business deals on behalf of ESOS. At various times, BISNOFF mentioned that ESOS had entered into deals with Lord of the Rings, which licensed merchandise, and Qalo, a manufacturer of silicone rings, however S.S. had no first-hand knowledge of the deals other than what BISNOFF told him. During his time on ESOS's Board of Directors, none of the deals mentioned by BISNOFF actually materialized. ESOS rings were never produced on a mass scale or manufactured overseas. Approximately one to two dozen prototype rings were produced using a 3D printer. The prototype rings were loaded with corporate funds, approximately $100 per ring, and only generated a few cents of revenue per transaction.

39. S.S. first learned ESOS did not own the patents for the smart ring technology when he testified in the civil lawsuit involving Prencipe and BISNOFF in Los Angeles (*see* paragraphs 22-24 above). S.S. did not know BISNOFF was soliciting individual investors, including through so-called "Friends and Family" allotments until he was contacted by the SEC in 2023. S.S. had no knowledge of any impending ESOS deals with Apple, including any purchase by Apple of ESOS.

40. S.S. resigned his seat on the ESOS Board of Directors around March 2023 after being contacted by an attorney for the SEC and a disgruntled investor on LinkedIn. At the time, the only other members of the ESOS board were BISNOFF and Scates.

41.  S.S. did not receive any return on his investment, resulting in a net loss of $150,000.

b.  *Victim-Investor A.S.*

42.  A.S., does business through Sandler Advisory Board, also known as Sandler Partners LLC; Telecom Las Vegas LLC, and SAS RivaRidge, LLC.  He is based in Redondo Beach, California. A.S. met BISNOFF's husband through work around 20 years ago and became friends with him.

43.  On December 12, 2017, BISNOFF sent an email to A.S. that offered a Friends and Family Advisory Board investment opportunity. BISNOFF advised Virgin was set to buy out all remaining Advisory Board shares effective December 15, 2017, for a 35 percent ownership of ESOS, so only a couple days remained to invest in the last 15,000 ESOS Advisory Board shares at a purchase price of $7 per share. BISNOFF advised the Advisory Shares would be repurchased at market price of $10 per share within 120 days after the vesting date of December 15, 2017.

44.  On December 28, 2017, BISNOFF advised A.S. in an email that ESOS had closed with Virgin on December 15, 2017, at $10 per share, and 15,000 Advisory Share pool shares were still available, but only to current shareholders for follow-on purchasing.

45.  As a result of BISNOFF's false and misleading statements, A.S. caused SAB to wire the following amounts on the following days to ESOS BofA account ending in 7373 to invest in ESOS:

a.  $105,000 on December 14, 2017;

b.   $100,000 on January 12, 2018.

46.   SAB did not receive any return on investment, resulting in a net loss of $205,000.

c.   *Victim-Investor L.K.*

47.   L.K., a resident of Pacific Palisades, California, met BISNOFF in October 2015 through neighbors. BISNOFF told L.K. she held patents for a smart ring that could make contactless payments and had started ESOS. BISNOFF asked L.K. to become an advisory ESOS board member, and L.K. agreed. The request was not unusual as L.K. had experience as a business executive and chief marketing officer at Fortune 100 companies, which included advising and mentoring startup companies.

48.   On December 5, 2017, BISNOFF sent L.K. an email that said she was accepting an offer from Virgin Mobile/Sprint to sell 35 percent of ESOS. BISNOFF offered L.K. 1,000 unused advisory board shares at $7 per share with a buy-back of $10 per share back after the deal with Virgin Mobile/Sprint closed on December 15, 2017.

49.   On February 24, 2018, BISNOFF sent L.K. an email that offered L.K. the opportunity to buy shares at the current value of $10, which BISNOFF said L.K. could sell for $13 to an investor who had already been lined up.

50.   On April 4, 2018, BISNOFF sent L.K. an email that said ESOS had completed a mass retail branding agreement with QALO and that, as of September 2018, ESOS-enabled products would be available under the QALO brand name at all QALO retailers, which

17

included Target, Wal-Mart, Lowes, REI, Dicks, Bass Pro Shops, Cabellas, and all U.S. military PX locations.

51. In April or May 2019, BISNOFF sent L.K. an email that offered her the opportunity to purchase additional ESOS shares at $10 per share, with immediate vesting and the opportunity to resell the shares at $19 per share.

52. On January 13, 2020, BISNOFF offered L.K. the opportunity to purchase additional ESOS shares at $23 per share, vesting no later than April 30, 2020, which she could then resell at $28 per share.

53. As a result of BISNOFF's false and misleading statements, L.K. invested in ESOS by wiring the following amounts on the following dates to ESOS BofA account ending 7373 and Citibank account X8828:

        a.  $10,500 on December 6, 2017(BofA);

        b.  $10,000 on April 30, 2018 (Citibank);

        c.  $20,000 on May 1, 2019 (Citibank);

        d.  $20,000 in two separate wires of $10,000 each on July 1, 2019(Citibank);

        e.  $23,000 on January 14, 2020 (Citibank).

54. BISNOFF repurchased the shares L.K . bought on December 6, 2017, and April 30, 2018, using in part other victim funds. For example, on December 19, 2017, BISNOFF repurchased L.K.'s $10,000 December 6, 2017, investment using $15,000 that can be traced to the $105,000 that victim-investor A.S. sent to ESOS on December 14, 2017.  On June 14, 2018, BISNOFF repurchased L.K.'s $10,000 April 30, 2018, investment using

18

$13,000 from her personal checking account that she routed through ESOS Citibank account ending 0533.

55.    Starting around July or August 2022, BISNOFF provided numerous excuses for failing to pay the amounts that should have resulted from the promised share buy-backs.  Among other reasons, BISNOFF said she had been diagnosed with terminal uterine cancer and was receiving cancer treatment at the University of California Los Angeles ("UCLA").

56.    Around August 10, 2022, BISNOFF left a check in an amount of $32,200 written from PNC account ending 3242 at L.K.'s doorstep.  When L.K. tried to deposit the check, it bounced.

57.    On August 19, 2022, BISNOFF withdrew $32,250 from her personal checking account (Citibank account X0533) and used it to repurchase L.K.'s January 14, 2020, investment, using proceeds that can be traced to a $40,000 wire transfer sent by a victim-investor that same day.

58.    In total, L.K. invested $83,500 and received a return of $60,200 for a net loss of $23,300.

            d.    *Victim-Investor R.K.*

59.    R.K., a resident of Pacific Palisades, California, was introduced to BISNOFF in 2014 through mutual friends.  On December 5, 2017, BISNOFF sent R.K. an email stating that she was accepting an offer from Virgin Mobile/Sprint to purchase 35 percent of ESOS. BISNOFF offered R.K. 1,000 unused advisory board shares at $7 per share with a promised buy-back of $10 per share that would take place after the deal with Virgin Mobile/Sprint closed on December 15, 2017.

60.  On May 21, 2018, BISNOFF sent R.K. an email stating: "Last call for shares! We have 5,000 shares left at $10 each, closing date for the sale is June 8 at $13 per share. New owner will be Roc Nation. Minimum purchase of 750 shares. We're selling core value of the patent and they will be program managing the release from this point onward."

61.  On or about August 14, 2018, BISNOFF sent an email to R.K. that stated, in part, "25,000 unvested share are available at $13 and will redeem at $17 on November 15. Those shares revert to Apple if not purchased. Please reach out immediately if you'd like to buy a minimum block of 3000 shares."

62.  On March 6, 2019, BISNOFF informed R.K. that ESOS's U.S. licensing would be done exclusively through Synchrony Bank, formerly GE Capital, and ESOS would become a licensing only entity as of April 20, 2019, which represented another ESOS investing opportunity at $10 per share with a promised redemption/buy-back of $19 per share on April 20, 2019.

63.  On November 12, 2019, BISNOFF advised R.K. of another investment opportunity due to a confirmed offer from entrepreneur Jamie Kern Lima to purchase a 34 percent ownership interest in ESOS at $31.50 per share. BISNOFF said that this investment opportunity was only open to current or past shareholders of Board Advisor/employee pool shares, that the purchase price was $22.50 per share, and that a buy-back at $31.50 per share would take place in January 2020.

64.  On December 29, 2020, BISNOFF thanked R.K. for patience during COVID, which BISNOFF claimed disrupted the ESOS

supply chain, launch dates, and product development, and advised of another investment opportunity to invest at $10 per share with a buy-back at $28 per share on January 25, 2021.

65.   As a result of BISNOFF's false and misleading statements, R.K. invested in ESOS by wiring the following amounts on the following dates to ESOS BofA account ending 7373 and Citibank account X8828:

        a.   $7,000 on December 6, 2017 (BofA);

        b.   $25,000 on May 31, 2018 (Citibank);

        c.   $39,000 on August 15, 2018 (Citibank);

        d.   $50,000 on March 7, 2019 (Citibank);

        e.   $56,250 on November 13, 2019 (Citibank);

        f.   $25,000 on December 30, 2020(Citibank).

66.   BISNOFF repurchased the shares R.K. bought with her first four ESOS investments, using in part funds from other victim-investors. For example, on October 21, 2019, BISNOFF used $123,750 of the $350,000 that Victim-Investor A.C. had just sent to ESOS that same day to buy back R.K.'s March 7, 2019, $50,000 investment.

67.   R.K.'s November 13, 2019, and December 30, 2020, investments were not bought back as BISNOFF had promised, resulting in a net loss of $81,250 principal.

68.   BISNOFF had promised an investment return of $162,500. Around August 22, 2022, BISNOFF gave R.K. a check in this amount drawn on ESOS PNC account X3242.  The check was returned for non-sufficient funds.

*e.    Victim-Investor A.C.*

69.  A.C., a resident of Los Angeles, California, met BISNOFF approximately 20 years ago through A.C.'s ex-spouse.  In 2018 BISNOFF notified A.C. that she had started a business called ESOS.  According to BISNOFF, ESOS sold contactless payment rings and business was booming. BISNOFF often boasted about pending ESOS deals with companies such as Amazon and Citibank. BISNOFF eventually offered A.C. the opportunity to invest in ESOS and told her she could double her money in months.

70.  On September 5, 2018, BISNOFF sent A.C. an email offering to sell ESOS shares for $10 per share with a buy-back at $17 per share on December 18, 2018, which was the date the USPTO would purportedly be registering the ESOS patent to Apple.

71.  On November 21, 2018, BISNOFF provided updates via email to A.C., including that PayPal had agreed to pilot ESOS payment rings for both PayPal and Venmo brands, with the first shipment arriving at PayPay HQ on December 5, 2018; the rings piloting for LA Metro averaged $117 per month in purchases generating $1.17 per month per ring in free cash flow for ESOS; and the ESOS ring customization website for direct to consumer sales through QALO would begin in the second quarter.

72.  On May 5, 2019, BISNOFF sent A.C. an email offering ESOS shares from the Series A employee pool at $10 per share. BISNOFF said that another ESOS Series A investor - Wearable Fintech - was bidding up the share price.

73.  On August 26, 2019, BISNOFF sent an email informing A.C. that, due to attention from Apple resulting from an extra patent ESOS had obtained, only current investors could take advantage of the offer of ESOS Series C Preferred shares from the employee pool.  The minimum purchase was 10,000 shares at $17.50 per share, with a promised buy-back at $22.50 per share between October 19-31, 2019. On August 27, 2019, BISNOFF advised that, due to the high number of Friends and Family who wanted to purchase the remaining shares as well as the tight timeframe for the buy-back, the ESOS board had agreed to reduce the minimum purchase to 4,000 shares.

74.  On September 30, 2020, BISNOFF sent an email to A.C. with another offer of shares, this one setting a maximum purchase of 50,000 shares at a price of $17.50 per share. BISNOFF stated that share buy-backs and licensing revenue would begin in January 2021.

75.  As a result of BISNOFF's false and misleading statements and representations, A.C. invested in ESOS by wiring the following amounts on the following dates to ESOS Citibank account X8828:

      a.  $25,000 on September 8, 2018;

      b.  $5,000 on May 10, 2019;

      c.  $70,000 on August 27, 2019;

      d.  $350,000 on October 21, 2019, via Fedwire.

76.  A.C. did not receive any return on her investment, resulting in a net loss of $450,000.

77.   BISNOFF provided numerous excuses for the delays in paying A.C. the promised investment returns, including that she was dying from cancer.

78.   Around January 2023, BISNOFF texted A.C. and asked A.C., who is a medical doctor, to prepare a letter for BISNOFF to submit to the court overseeing a lawsuit in which she was involved. BISNOFF wanted to be excused from attending the proceedings in person because of her terminal cancer. BISNOFF said her oncologist was on maternity leave and unavailable to draft the letter. Because A.C. was on vacation, BISNOFF offered to prepare the letter and send it to A.C. for her signature. The letter BISNOFF prepared stated that she had stage three endometrial carcinoma and required radiation treatment every day and chemotherapy two to three times per week. Because BISNOFF had previously told A.C. she had terminal cancer, A.C. agreed to sign the letter.

79.   In December 2023, after discovering that the SEC had sued BISNOFF, A.C. queried an internal medical historical database for the Los Angeles area regarding BISNOFF and discovered no patient records reflecting a cancer diagnosis or any cancer treatment.

f.    *Victim-Investor K.W.*

80.   K.W., a resident of Los Angeles, California, first met BISNOFF approximately 12 years ago. BISNOFF often spoke of her company ESOS, discussed ESOS-related legal matters, and showed K.W. pictures of smart ring prototypes. At some point during

their friendship, BISNOFF approached K.W. about investing in
ESOS.

81. Based on BISNOFF's portrayal of ESOS and her showing
K.W. the smart ring prototypes, K.W. assumed BISNOFF owned the
relevant patent; this understanding was confirmed by the legal
matters BISNOFF discussed, including litigation about ownership
of the patent.

82. As a result of BISNOFF's representations about ESOS,
K.W. invested in ESOS by wiring the following amounts on the
following dates to ESOS Citibank account ending 8828:

        a.   $40,000 on August 3, 2019;

        b.   $25,000 on February 6, 2020;

        c.   $25,000 on November 16, 2020;

        d.   $25,000 on July 15, 2021;

        e.   $10,000 on January 7, 2022;

        f.   $3,000 on June 2, 2022.

83. On October 21, 2019, BISNOFF wired $99,000 to K.W.
This money came directly from the $350,000 that Victim-Investor
A.C. had wired to the Citibank X8828 account that same day.
K.W. did not receive any other return on her investment,
resulting in a net loss of $29,000.

                  *g.   Victim-Investor T.L.*

84. T.L., at the time a resident of Carmel, California,
met BISNOFF in around 2014-2015, through the Brentwood Community
Council. BISNOFF often spoke of her company ESOS.

85. Around July 2018, BISNOFF said in an email to T.L.
that Apple was going to buy ESOS and, as BISNOFF owned ESOS's

intellectual property, it was a great first-time investment opportunity. BISNOFF offered ESOS shares at $10 per share with a promised $15 buy-back after the Apple purchase was finalized.

86.  As a result of BISNOFF's false and misleading statements, on July 23, 2018, T.L. invested in ESOS by wiring $40,000 to ESOS Citibank account X8828. On August 28, 2018, BISNOFF returned the money to T.L. due to purported issues with the Apple sale.

87.  On September 5, 2018, BISNOFF advised T.L. that the USPTO indicated the patent assignment relevant to the purported sale to Apple would post on or by November 6, 2018, and offered T.L. another investment opportunity.

88.  As a result of BISNOFF's false and misleading statements, on October 11, 2018, T.L. invested in ESOS by wiring $40,000 to ESOS Citibank account X8828.

89.  On August 28, 2019, T.L. received a wire of $60,000 from the ESOS Citibank account X8828, which was purportedly the proceeds of the buy-back of the ESOS shares he had purchased on October 11, 2018. This was a Ponzi payment: The funds can be traced to the $70,000 received from Victim-Investor A.C. one day earlier, namely, on August 27, 2019.

90.  In December 2020, BISNOFF offered T.L. another opportunity to invest in ESOS.  Based on the August 2019 return on his October 2018 investment, and updates on ESOS's business that BISNOFF provided, on December 29, 2020, T.L. wired $25,000 to ESOS Citibank account X8828 as a further investment.

91.  T.L. was never paid his promised return per the completed December 2020 stock agreement. BISNOFF offered various excuses including having cancer and dealing with legal issues purportedly arising from a board member's attempted theft of ESOS's IP.  T.L. suffered a net loss of $5,000.

        *h.  Victim-Investor M.H.*

92.  M.H., a resident of Santa Monica, California, met BISNOFF's husband through mutual friends. During social gatherings, BISNOFF would talk about ESOS; based on conversations with BISNOFF and her husband, M.H. understood BISNOFF owned the patent for a wearable ring housing a contactless payment system, which was known as the ESOS Ring.

93.  BISNOFF presented ESOS as a very successful company, with rings already in production and various established distribution channels. BISNOFF claimed ESOS was in distribution deals with Walmart, Target, and CVS, and ESOS had several large investors such as a company operating in Tulsa, Oklahoma and billionaire Jamie Kern Lima.

94.  In early October 2020, BISNOFF sent K.S. a solicitation via email to invest in ESOS, which K.S. forwarded to M.H. M.H. requested an investment packet and, in response, BISNOFF provided audited financial information (which stated that over 500,000 rings had been created), an ESOS sales deck presentation, financial projections, a 2019 tax return (as noted in paragraph 17 above, the CPA's signature as preparer on the return is forged), and a patent valuation estimate. BISNOFF offered M.H. 3,000 ESOS shares at $10 per share, with a promised

return through a buy-back of at least $17.50 per share in February 2021.

95.  As a result of BISNOFF's false and misleading statements, on October 13, 2020, M.H. invested in ESOS by wiring $30,000 to ESOS Citibank account X8828.

96.  February 2021 passed and M.H. had not been paid as promised. When he asked BISNOFF about it, she claimed numerous excuses such as that the 500,000 rings were backordered and ESOS was going live with Walmart in December 2021. Around July 2022, BISNOFF promised to wire M.H. his buy-back proceeds, but no money had been sent by August 2022 and BISNOFF kept making excuses.

97.  From August 8 through 22, 2022, in email and text communications, BISNOFF told M.H. that she was going to send a cashier's check instead of a wire.  BISNOFF ultimately sent M.H. a check in the amount of $97,200 drawn on ESOS PNC account X3242, however, the check was returned for non-sufficient funds. Despite numerous promises of payment, M.H. did not receive any return on his investment, resulting in a net loss of $30,000.

*i.  Victim-Investor D.Z.*

98.  D.Z., a resident of Pacific Palisades, California, was introduced to BISNOFF through mutual friends. D.Z. learned BISNOFF had invented a contactless payment ring technology, and that others had invested successfully in her company ESOS. In February 2021, BISNOFF solicited D.Z. initially by telephone and then via email to invest in ESOS. BISNOFF claimed ESOS was transferring ownership and advised that, thanks to COVID,

contactless payments had taken off, and BISNOFF wanted to know
if D.Z. wanted to take advantage of this opportunity. BISNOFF
provided an investor packet and offered D.Z. 25,000 shares at
$10 per share, with a promised buy-back at $31 per share no
later than March 1, 2021.

99.  As a result of BISNOFF's false and misleading
statements, on February 4, 2021, D.Z. invested in ESOS by wiring
$250,000 to ESOS Citibank account X8828 via Fedwire.

100. D.Z. did not receive the promised return on his
investment.  BISNOFF made excuses, including that she was
struggling with cancer. D.Z. suffered a net loss of $250,000.

               *j.    Victim-Investor K.S.*

101. K.S., a resident of Santa Monica, California, was
introduced to BISNOFF in 2018 and frequently socialized with
her. BISNOFF claimed to have previously worked for Elon Musk and
to currently own a company called ESOS, which owned a patent and
manufactured rings tied to a person's bank account and able to
make contactless payments. BISNOFF described lawsuits involving
people trying to steal her patent.

102. BISNOFF claimed she was currently talking with Apple
about ESOS technology. Around late October 2020, BISNOFF emailed
K.S. and offered her a Friends and Family ESOS stock purchase
opportunity; BISNOFF also provided an ESOS investor packet that
included financial statements. K.S. declined. Approximately one
year later, BISNOFF again emailed K.S. with another ESOS
investment opportunity and promises of a great and quick return,
but with a 24-hour deadline to accept. BISNOFF said she was in

current negotiations with Valid in Brazil, which would be publicly announced the following Monday.  BISNOFF was offering ESOS shares at $10 each, with a promised buy-back of $24.12 per share in January 2022. BISNOFF provided an ESOS patent valuation, certified financial statements, monthly financial projections including revenue and net income, and a stock purchase agreement. K.S. said she could only afford $10,000, but BISNOFF pressured K.S. to invest more and reassured K.S. that she would be able to quickly cash-out her investment.

103. As a result of BISNOFF's false and misleading statements, on December 2, 2021, K.S. invested in ESOS by wiring $20,000 to ESOS Citibank account X8828.

104. When there was no press release as BISNOFF had said there would be, K.S. began to have a bad feeling about her investment. The promised buy-back also did not occur and BISNOFF provided numerous excuses for why it had not. Around August 20, 2022, BISNOFF told K.S. that she was leaving a check on K.S.'s front porch. K.S. retrieved the check but, when she took it to her bank, she learned that there were no funds in the BBVA/PNC account on which the check had been written.

105. K.S. did not receive any return on her investment, resulting in a net loss of $20,000.

3.  BISNOFF's Use of the Victim-Investors' Money

106. Although BISNOFF represented that the invested monies would be used for ESOS's business, in fact, from 2017 to 2023, BISNOFF used a significant portion of the $2,140,250 she received from investors for personal expenses.  This included

paying over $700,000 for her rent on her personal residence, which exceeded $150,000 per year.  BISNOFF used approximately $775,806 of investor funds to make Ponzi-like payments to prior investors. As an example, on October 21, 2019, A.C. wired $350,000 to ESOS Citibank Account x8828, which had an account balance of $16,566 at the time, and on the same day, BISNOFF made the following Ponzi-like payments: $99,000 to victim K.W. and $123,750 to victim R.K.  BISNOFF also transferred over $300,000 to herself or her personal bank account to pay for personal debts.

107. Although BISNOFF told her victims that ESOS's business was thriving, for most of the 2017-2013 period, ESOS's Citibank x8828 business account maintained anemic account balances prior to investor deposits, incurring over $51,000 in bank fees. An analysis of the account did not identify any significant business income or revenue, and the majority of deposits were comprised of investor and EIDL deposits.

### C.    BISNOFF's Efforts to Obstruct the Investigation

108. On November 16, 2023, I received a telephone call from two attorneys at the law firm Eisner Gorin LLP who said they represented BISNOFF.  The attorneys said they had learned of an FBI investigation into BISNOFF and ESOS from the Los Angeles Police Department ("LAPD") and inquired about the status of the investigation. The attorneys said that BISNOFF was under hospice care due to stage four endometrial cancer. I confirmed that the FBI had initiated an investigation into BISNOFF but said that I could not comment on the status on the investigation.

31

109.   On March 27, 2024, I interviewed Scates regarding BISNOFF and ESOS. The following day, BISNOFF contacted the Los Angeles District Attorney's Office ("LADAO") regarding her approximately seven-year-old allegation against Prencipe.  The LADAO contacted an LAPD Detective who, in turn, contacted me with questions concerning BISNOFF.

110. On April 9, 2024, an Assistant District Attorney at the Santa Cruz County District Attorney's Office ("SCDAO") told me the following:

111. In March 2024, BISNOFF and Scates filed a grand theft complaint and police report alleging that Prencipe had stolen a patent.  This was over a year after a jury trial in which McLear US was found to be the rightful owner of an undivided, 100 percent interest in the '609 Patent Family. (*See* paragraph 24, above.)

112. After the SCDAO declined to file charges on or about April 3, 2024, BISNOFF began harassing SCDAO officials via telephone messages sent from telephone number (213)788-3062 and email address Esos_CR@proton.me. BISNOFF continued these contacts through April 8, 2024, when the SCDAO forwarded the information to the FBI.

## V.  <u>CONCLUSION</u>

113. For all the reasons described above, there is probable cause to believe that BISNOFF has committed wire fraud, in violation of 18 U.S.C. § 1343k and Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. 240.10b-5.

_____
Marni A. Barton, Special Agent
Federal Bureau of
Investigation

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _12th_ day of
July, 2024.

_____
HON. PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE

33